Date signed September 16, 2014



DAVID E. RICE
U.S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| WALTER GOODWICH, | * | Case No. 13-10558-DER |
| Debtor. | * | (Chapter 7) |

\* \* \* \* \* \* \* \* \* \* \* \* \*

| | | |
|---|---|---|
| MURRAY KOVENS, | * | |
| Plaintiff, | * | |
| vs. | * | Adversary Pro. No. 13-00215-DER |
| WALTER GOODWICH, | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

### <u>MEMORANDUM OPINION</u>

Murray Kovens ("Kovens") holds a claim based upon a judgment he obtained in 2001 in a state court in Pennsylvania (and later domesticated in a Maryland court) against Walter Goodwich ("Goodwich"). After Goodwich filed a Chapter 7 bankruptcy petition in this court in 2013, Kovens filed a complaint seeking a determination that his claim against Goodwich is

excepted from discharge (that is, not dischargeable) under § 523(a)(2)(A), § 523(a)(2)(B), and/or § 523(a)(4) of title 11 of the United States Code (the "Bankruptcy Code").

A trial on the merits of the complaint was conducted on April 24 and April 25, 2014. At trial, Kovens, Goodwich, and a number of other witnesses testified, and the parties offered numerous documents that were admitted into evidence. Following closing argument, the court ordered the parties to submit a post-trial memorandum of law. Those memoranda were filed on June 9, 2014. Kovens filed a reply memorandum on June 19, 2014.

During closing argument, Goodwich raised for the first time a defense based on the assertion that his liability to Kovens has been satisfied. The amount Goodwich must pay to satisfy his remaining liability to Kovens under the judgment, however, cannot be determined from the evidence presented to this court. That question is thus a matter that must be decided later by the Maryland or Pennsylvania courts.

The assertion by Kovens that his claim against Goodwich is a debt excepted from discharge under § 523(a)(4) of the Bankruptcy Code rests on the contention that Goodwich was acting in a fiduciary capacity when he betrayed Kovens, his friend and accounting client. As explained below, Goodwich was not a fiduciary for purposes of determining dischargeability. Thus, the § 523(a)(4) exception is not applicable.

Goodwich did, however, use misrepresentations and a false financial statement to induce Kovens to make a loan guaranteed by Goodwich that was not repaid. Thus, for the reasons explained in this memorandum opinion the claim held by Kovens is excepted from discharge under both § 523(a)(2)(A) and § 523(a)(2)(B) of the Bankruptcy Code.

## JURISDICTION

This court has subject matter jurisdiction over this proceeding under 28 U.S.C. § 1334, 28 U.S.C. § 157(a), and Rule 402 of the Local Rules of the United States District Court for the District of Maryland. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(I). This memorandum opinion constitutes the court's findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure (made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure).

## FINDINGS OF FACT

Kovens and Goodwich became acquainted when they attended high school together in the 1950's. Although Kovens attended but did not graduate from college, he is an experienced businessman who has enjoyed a long working career in the vending machine business. Kovens eventually formed and continues to operate his own business, A. Kovens Vending Corporation ("Kovens Vending"). In the meantime, Goodwich attended and graduated from college, and went to work in the accounting business with the accounting firm of Goodwich Stoller & Associates ("GSA"). Although Goodwich worked as an accountant, he was never a certified public accountant.

Kovens engaged GSA in 1993 to provide accounting services for himself and for Kovens Vending. Initially, Goodwich was the primary accountant for both Kovens and Kovens Vending. Beginning in the mid to late 1990's, however, the accounting work was handled by Jane Pitt and Jeff Stoller, both of whom were accountants employed by GSA. Kovens nevertheless believed that Goodwich was reviewing their work and continued to regard Goodwich as his primary accountant. Goodwich was, as he admits in his answer, Kovens's accountant. As a result, Goodwich knew everything about the finances of both Kovens and Kovens Vending. With the

exception of the ill-fated investment in the Jimmy Buffet concert at issue here, the only other investment advice given to Kovens by Goodwich was a suggestion (adopted by Kovens) that the Fidelity Investments firm would be a good financial adviser. GSA continues to provide accounting services to Kovens and Kovens Vending. GSA apparently was and is still paid an annual retainer for its services.

In 1999, Goodwich was introduced to Carl A. Glorioso ("Glorioso") by Samuel R. Alascia ("Alascia"), one of Goodwich's clients. Glorioso was the president of Charm City Productions, Inc. ("Charm City"). Glorioso was subsequently indicted, pled guilty, and served 37 months in a Federal penitentiary for fraud in connection with, among other things, events related to the claim asserted by Kovens against Goodwich.

## The Amy Grant Concerts

Glorioso convinced Goodwich to invest in two MTV videos or concerts that were being promoted by Charm City. Goodwich received a profit on his MTV investments with Charm City. Thereafter, Goodwich introduced Glorioso to another of his accounting clients, Rudolph W. Nechay ("Nechay"). As a result, Nechay agreed to invest in a series of four Christmas concerts by Amy Grant that were to take place in late November and early December of 1999 in (i) Dayton, Ohio, (ii) Columbus, Ohio, (iii) Chicago, Illinois, and (iv) St. Louis, Missouri. In order to invest in the Amy Grant concerts, Nechay formed a corporation known as Backers, Inc. ("Backers"), which borrowed $880,000 from Maryland Permanent Bank and Trust Co. ("MPB") on October 12, 1999 for that purpose. Goodwich personally guaranteed the MPB loan to Backers. On October 12, 1999, Goodwich entered into an Investment Agreement with Charm City (the "Amy Grant Investment Agreement"). The terms of the Amy Grant Investment agreement provided that 40% of the net profits from the four Amy Grant concerts would be paid

to Goodwich in consideration for his guarantee of the $880,000 loan by MPB to Backers.  The Amy Grant Investment Agreement stated that the concerts were scheduled to take place on or before December 13, 1999, and that the MPB loan would be repaid and Goodwich would be paid his share of the profits within 21 days after the four concerts were held.

Glorioso testified credibly that in October of 1999 and at or about the time that the Amy Grant Investment Agreement was executed, he issued three post-dated checks drawn on an account of Charm City at NationsBank, N.A. that were payable to "D&D Equities" in the aggregate amount of $50,000 (the "Post-Dated Checks").  Each of the Post-Dated Checks was dated December 14, 1999.  D&D Equities was a real estate firm that was wholly owned by Goodwich.  Glorioso testified that the Post-Dated Checks were issued by Glorioso in connection with the Amy Grant Investment Agreement with instructions that they be held and not deposited. A copy of the front side of each of the Post-Dated Checks was introduced into evidence at trial. Kovens testified that he did not remember how he obtained the copies of the Post-Dated Checks, and admitted that he has never seen the back of the Post-Dated Checks and does not know if they were ever endorsed or cashed.  Nothing in the record indicates that the Post-Dated Checks were ever negotiated by D&D Equities or Goodwich.  The only evidence presented on this point was the testimony of Glorioso that he did not believe the Post-Dated Checks were ever honored and charged against Charm City's account.  Based upon the evidence presented at trial, I find that the Post-Dated Checks were issued in October of 1999 in connection with the Amy Grant Investment Agreement and not the later Jimmy Buffet investment agreement, and that the Post-Dated Checks were never cashed or deposited by D&D Equities or Goodwich.

The four Amy Grant concerts took place, but Glorioso lied about his involvement in producing them.  In fact, those concerts were produced by a third party and neither Glorioso nor

Charm City had any involvement (financial or otherwise) in the concerts. Goodwich made occasional inquiries of Glorioso about the status of the Amy Grant concerts, to which Glorioso simply responded that they were "going well." Goodwich made no other effort until after December 13, 1999 to follow up on his investment or to determine the extent to which he would be paid any profits under the Amy Grant Investment Agreement.

### The Jimmy Buffet Concert

Meanwhile, Glorioso suggested that Goodwich locate an investor who could help finance a Jimmy Buffet concert supposedly to be produced by Charm City in March of 2000. Goodwich contacted Kovens in November of 1999 about making an investment in the Jimmy Buffet concert. At the time, Kovens was not interested in investing in concert promotion, had never heard of Jimmy Buffet, and was not seeking investment advice from Goodwich. Kovens was initially reluctant to become involved. Goodwich persisted, however, and Kovens eventually agreed to make a loan of $302,500 to Charm City to finance the supposed Jimmy Buffet concert.

Charm City, Goodwich, and Kovens thus entered into an Agreement on December 13, 1999 (the "Jimmy Buffet Investment Agreement"). Pursuant to the terms of the Jimmy Buffet Investment Agreement (i) Kovens made the $302,500 loan to Charm City, (ii) Glorioso and Goodwich guaranteed repayment by Charm City of that loan, and (iii) the profits from a supposed Jimmy Buffet concert to take place in Boston on March 18, 2000 were to be divided among the three parties as follows: 40% to Kovens, 40% to Charm City, and 20% to Goodwich. The Guaranty executed by Goodwich on December 13, 1999 authorized Kovens to obtain a confessed judgment against Goodwich in any court of record in the United States for any unpaid sum due on the loan to Charm City, plus costs and reasonable attorney's fees.

Kovens made the loan to Charm City as agreed in three advances. The first was a check dated December 13, 1999 in the amount of $5,811.78 payable to Maryland Permanent Insurance Group for supposed insurance coverage for the Jimmy Buffet concert. The second was a wire transfer on December 15, 1999 in the amount of $284,688.22 to a Charm City account at Bank of America. The third was a check dated March 9, 2000 in the amount of $12,000 payable to Charm City.

## The Representations and Inducements by Goodwich

Goodwich played an active and key role in the events that induced Kovens to make the loan to Charm City. Goodwich made repeated telephone calls to Kovens pressuring him to make the loan. Goodwich met several times with Kovens about the investment in the supposed Jimmy Buffet concert. One such meeting took place in Stewartstown, Pennsylvania at the business office of Kovens Vending. Glorioso was present with Goodwich at that meeting, which according to Kovens was the only time Goodwich ever came to the Stewartstown office. On more than one occasion, Goodwich bragged to Kovens about the supposed profits Goodwich was making on his investment in the Amy Grant concerts. In his testimony, Goodwich denied that he bragged to Kovens about his profits on the Amy Grant concerts, testimony which I do not find credible. I believe and find that Goodwich told Kovens repeatedly that he was making profits on his investment with Glorioso in the Amy Grant concerts.

When Kovens asked Goodwich to substantiate his profits on the investment in the Amy Grant concerts, Goodwich asked Glorioso to provide that information to Kovens. As a result, Glorioso sent Kovens a letter dated December 1, 1999 and enclosed copies of "the P&L Statement for the Amy Grant Christmas Shows," the Amy Grant Investment Agreement, and "the projections for the Jimmy Buffet shows." The profit and loss statement for the Amy Grant

concerts provided to Kovens showed that the four concerts had produced a "net profit" in the amount of $301,359. The expense and revenue projection for the Jimmy Buffet concert indicated a projected net profit for a single Jimmy Buffet concert of $145,000 – which would result in a purported projected share of profits under the Jimmy Buffet Investment Agreement for Kovens of $58,000 and for Goodwich of $29,000.

These acts were representations by Goodwich that he had made a profit on his investment in the Amy Grant concerts. Those representations were false. Glorioso had not produced the concerts and no profit had been realized. At the time Kovens entered into the Jimmy Buffet Investment Agreement with Charm City and Goodwich on December 13, 1999, Goodwich had not been paid anything on account of supposed profits on the Amy Grant concerts and under the Amy Grant Investment Agreement he was not to be paid anything by way of profits until January 3, 2000. The representations were at the very least made by Goodwich in reckless disregard of the truth because he knew at the time the representations were made that he did not know whether he had realized any profit from the Amy Grant concerts. Nevertheless, Goodwich led Kovens to believe that was the case. Kovens would not have made the $302,500 loan to Charm City if he knew that profits on the Amy Grant concerts were not actually being realized.

As an additional inducement for Kovens to make the $302,500 loan to Charm City, Goodwich provided Kovens with a written financial statement sometime between December 1, and December 7, 1999. The financial statement was presented to Kovens as an accurate presentation of Goodwich's financial position at the time Goodwich guaranteed the loan by Kovens to Charm City on December 13, 1999. The financial statement, dated June 10, 1999, was accurate as of that date but was false at the time it was delivered to Kovens. The financial statement indicated Goodwich had a net worth of $1,417,777. It failed to disclose, however,

additional liabilities of Goodwich in the amount of at least $980,000 – namely, (i) his guarantee of the $880,000 loan by MPB to Backers, and (ii) a $100,000 promissory note to Nechay and Eva M. Nechay dated October 8, 1999.  As a result, the financial statement materially overstated Goodwich's net worth.   The false presentation of Goodwich's net worth in the financial statement was not negated by the fact that Kovens was also provided a copy of the Amy Grant Investment Agreement in which the guarantee of the $880,000 loan by MPB to Charm City was disclosed.  Kovens was simultaneously being told falsely by Goodwich that profits were being made on the Amy Grant concerts.  If Goodwich was making profits on the concerts as he represented, he would have had no liability on the $880,000 guarantee.

Kovens was represented in connection with the Jimmy Buffet Investment Agreement by Jody Anderson, an attorney with the York, Pennsylvania law firm of Stock & Leader.  Kovens provided copies of the various documents he received to Jody Anderson for her review on his behalf before he entered into the Jimmy Buffet Investment Agreement.

Kovens made the loan to Charm City because he trusted and relied upon Goodwich, his long-time friend and accountant.  He made the loan based not merely upon Goodwich's recommendation, but also upon Goodwich's false representations that he made profits on his investment in the Amy Grant concerts, and Goodwich's financial statement that falsely presented his net worth as more than sufficient to repay the loan.  Kovens was justified in relying on Goodwich's false representations and was reasonable in relying on the false financial statement. Indeed, Goodwich acknowledged that to be the case when he testified that Kovens "relied upon my opinion, period."

### Discovery of Glorioso's Fraud

There is some reason for Kovens to question Goodwich's contention that he had no doubts about the legitimacy of Glorioso and Charm City at or before the time Kovens made the $302,500 loan to Charm City.   According to Goodwich's testimony, virtually immediately following the execution of the Jimmy Buffet Investment Agreement on December 13, 1999, Goodwich began to press Glorioso for an accounting of his profits on the Amy Grant concerts. Glorioso put off Goodwich with a variety of excuses and evasive responses.  Goodwich testified that he was suspicious that "something was not right" and Glorioso "may have done something improper" by December 15, 1999 – that is, only two days after execution of the Jimmy Buffet Investment Agreement and the day of the $284,688.22 payment by Kovens to Charm City.  On the other hand, there is no evidence that Goodwich knew that Glorioso was perpetrating fraud when the Jimmy Buffet Investment Agreement was executed on December 13, 1999, and Goodwich denies that he knew that was the case at the time.  In any event, Goodwich did not know (and knew he did not know) on December 13, 1999 whether he had realized any profits under the Amy Grant Investment Agreement.

Eventually, Goodwich and Alascia learned by some means that Glorioso had left the United States and was in Canada.  Alascia went to Canada in January of 2000 to confront Glorioso, but Glorioso returned to the United States as Alascia arrived there to confront him. After Alascia's return, Goodwich and Alascia (or one of them) hired a private investigator in February of 2000 to conduct an investigation of Glorioso.  While these events were taking place, Goodwich said nothing to Kovens about his suspicions about Glorioso.

In March of 2000, Kovens made a telephone call to Goodwich about an unrelated business matter.  The call occurred after Kovens made the third installment payment to Charm

City on March 9, 2000 and before the supposed Jimmy Buffet concert was to occur on March 17, 2000.  During that conversation, Kovens asked Goodwich about how Glorioso was doing with the Jimmy Buffet concert.  In response, Goodwich acknowledged for the first time that he believed the loan to Charm City for the Jimmy Buffet concert was a fraud perpetrated by Glorioso.  At trial, Kovens insisted in his testimony that during this conversation Goodwich admitted guilt in the fraudulent scheme.  In his testimony, however, Goodwich denied that was the case and stated that he had made the telephone call to Kovens to inform him that Glorioso was a fraud and to urge Kovens to take legal action on Goodwich's guarantee in order to protect himself from legal actions being taken by Nechay against Goodwich.

After considering the demeanor and credibility of the witnesses, I believe it was Kovens who made the telephone call that resulted in the conversation about Glorioso, but I believe Goodwich's account of what was said on the telephone call.  Glorioso testified credibly that Goodwich knew nothing about, and did not participate knowingly in, the frauds related to either the Amy Grant or the Jimmy Buffet concerts.  Goodwich was paid nothing with respect to the Amy Grant and Jimmy Buffet concerts.  Goodwich had no ownership interest in Charm City. There is no evidence Goodwich ever expected to be paid (or was in fact paid) directly or indirectly any of the money loaned by Kovens to Charm City.  Goodwich was simply duped by Glorioso, and as a result was financially destroyed himself.  Under the circumstances, it is entirely believable that Goodwich would inform Kovens when he called that Glorioso was a fraud and that Goodwich would then express regret for the outcome and his betrayal of their friendship.  At that point, he could no longer remain silent whatever his embarrassment and fear of the likely reaction by Kovens; that Goodwich waited so long to acknowledge what he admits he had realized some three months earlier is itself an acknowledgment that Goodwich knew his

conduct was wrong.  I do not believe, however, that Goodwich admitted he was a knowing participant in the fraud perpetrated by Glorioso.  Moreover, I do not find that Goodwich was a knowing participant in that fraud.

After the telephone conversation, Goodwich reported Glorioso's conduct to the United States Attorney.  Thereafter, Glorioso was indicted on October 26, 2000, entered into a plea agreement in 2001, and was sentenced on May 3, 2002 to imprisonment for 37 months.

Glorioso made three payments totaling $175,000 to Kovens, but never paid the remaining balance due on the $302,500 loan.  When Glorioso and Charm City failed to repay the loan, Kovens filed a complaint and obtained an immediate confessed judgment on October 22, 2001 in the amount of $217,604.15 against Goodwich in the Court of Common Pleas for York County, Pennsylvania (the "Pennsylvania Judgment").  The Pennsylvania Judgment was domesticated in Maryland as a foreign judgment on March 22, 2002 in the Circuit Court for Baltimore County, Maryland (the "Maryland Judgment").  The Maryland Judgment was renewed by Kovens on November 2, 2011 in accordance with Maryland Rule 2-625.

Goodwich's answer admits the allegation made in paragraph 25 of the complaint that as of the date Goodwich filed his Chapter 7 bankruptcy petition his liability to Kovens on the Pennsylvania Judgment was $452,601.72.  He argued in closing, however, that the amount had been calculated incorrectly and/or that the Pennsylvania Judgment had been satisfied by the various payments made to Kovens. The court finds that these arguments are not supported by the evidence.

## CONCLUSIONS OF LAW

**I.    Satisfaction of the Debt**

Goodwich asserted in his post-trial memorandum (incorrectly) that the payments received by Kovens totaled $425,800.  The evidence presented and discussed in his memorandum, however, shows that the total was only $325,800 – the $175,000 paid by Glorioso, the $150,000 paid to settle the malpractice claims against Jody Anderson and her firm, and the $800 received from collection efforts.  In any event, Goodwich now asserts that his liability has been satisfied merely because these payments total more than the $302,500 loaned by Kovens.  This over-simplified approach ignores the calculation of both pre- and post-judgment interest, late charges, attorney's fees Kovens was entitled to under the promissory note and guaranty, and the extent to which the $150,000 paid to settle claims against Jody Anderson and her firm should be credited, if at all, against Goodwich's liability to Kovens.

The evidence before this court simply does not enable the court to determine the remaining liability to Kovens.  Indeed, the evidence before this court strongly suggests that Goodwich's liability to Kovens is far from satisfied.  That being the case, determination of the amount of the unpaid liability should be made by the Maryland or Pennsylvania courts.

**II.    Dischargeability of the Debt**

The exceptions to discharge specified by Congress in § 523 of the Bankruptcy Code are to be construed narrowly.  As the Fourth Circuit has repeatedly made clear, "[w]hen considering the applicability of an exception to discharge, [a court must] construe the exception narrowly 'to protect the purpose of providing debtors a fresh start.'"  Nunnery v. Rountree (In re Rountree), 478 F.3d 215, 219 (4th Cir. 2007) (quoting Foley & Lardner v. Biondo (In re Biondo), 180 F.3d 126, 130 (4th Cir. 1999)).  The Supreme Court has long cautioned against broad constructions of

exceptions to discharge because they "would be incompatible with the 'well-known' guide that exceptions to discharge 'should be confined to those plainly expressed.'" Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998) (quoting Gleason v. Thaw, 236 U.S. 558, 562 (1915)). See also, Bullock v. BankChampaign, 569 U.S. ___, ___, 133 S.Ct. 1754, 1760 (2013).

Conversely, this court must be "equally concerned with ensuring that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." Biondo, 180 F.3d at 130. As the Supreme Court has indicated, while the Bankruptcy Code provides a debtor with "'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt,'" the Bankruptcy Code also "limits that opportunity to the 'honest but unfortunate debtor.'" Brown v. Felsen, 442 U.S. 127, 128 (1979) (quoting Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934)).

The burden of proof is on the creditor to establish by a preponderance of the evidence that a debt is not dischargeable. Kubota Tractor Corp. v. Strack (In re Strack), 524 F.3d 493, 497 (4th Cir. 2008) (citing Grogan v. Garner, 498 U.S. 279, 291 (1991)); Colombo Bank v. Sharp, 477 B.R. 613, 619 (D. Md. 2008). Although the allowance of a claim is generally governed by state law, "the issue of non-dischargeability is a matter of federal law governed by the Bankruptcy Code." Reinheimer v. Ortman (In re Reinheimer), 509 B.R. 12, 18 (Bankr. D. Md. 2014).

When (as here) a creditor has reduced a claim to judgment in a state court prior to bankruptcy, the bankruptcy court generally "must give the same preclusive effect to [the] state court judgment as the forum that rendered the judgment would have given it." Sartin v. Macik, 535 F.3d 284, 287 (4th Cir. 2008) (citing Allen v. McCurry, 449 U.S. 90, 96 (1980); Pahlavi v. Ansari (In re Ansari), 113 F.3d 17, 19 (4th Cir. 1997)). As the Supreme Court has made clear,

however, where the basis for the nondischargeability of a claim cannot be determined from the record of the state court proceedings, the creditor is entitled to present extrinsic evidence in the bankruptcy court to support a determination that the claim is not dischargeable.  Brown v. Felson, 442 U.S. at 138-39; see also, Nunnery, 478 F.3d at 220 ("[The Supreme Court] has ruled that a bankruptcy court may look behind the record of the underlying judgment to determine if the debtor indeed obtained the debt through fraudulent means."); Gulati v. McClendon (In re McClendon), 415 B.R. 170, 182 (Bankr. D. Md. 2009) ("Collateral estoppel is not appropriate when a finding of nondischargeability requires proof of an element not litigated in an earlier proceeding.").  Thus, Kovens was permitted to present such extrinsic evidence at trial.

With these general principles in mind, I turn to consideration of whether Goodwich's remaining liability on the judgment is nondischargeable under the three provisions § 523(a) of the Bankruptcy Code relied upon by Kovens.

### A.    Section 523(a)(4)

Under § 523(a)(4) of the Bankruptcy Code, a discharge granted to an individual Chapter 7 debtor does not discharge a debt for fraud or defalcation while acting as a fiduciary.[1] Recently in Fleming v. Gordon (In re Gordon), 491 B.R. 691 (Bankr. D. Md. 2013), Judge Keir explained that a creditor asserting such a nondischargeability claim must prove: "(1) the establishment of an express trust regarding the funds; (2) that the debtor acted in a fiduciary capacity; and (3) the debt is based upon the debtor's fraud or defalcation while acting as a fiduciary."  Id. at 697 (citing Pahlavi, 113 F.3d at 20).

---

[1]  The language of this exception to discharge provides that "[a] discharge under section 727 … of [the Bankruptcy Code] does not discharge an individual debtor from any debt … for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny."  11 U.S.C. § 523(a)(4).

It is well settled that for purposes of § 523(a)(4), the term "fraud" means "positive fraud, or fraud in fact, involving moral turpitude or intentional wrong." Neal v. Clark, 95 U.S. 704, 709 (1877). Likewise, it is now also well settled that in the context of this statute that the term "defalcation" requires a finding of at least "an intentional wrong" or in the absence of intentional wrongdoing, a finding that "the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." Bullock v. BankChampain, 569 U.S. at ___, 133 S.Ct. at 1759 (quoting ALI, Model Penal Code § 2.02(2)(c), p. 226 (1985)).

In the present case, however, the issue in the first instance is whether Goodwich had a fiduciary relationship with or duty to Kovens at the time of the events related to the supposed Jimmy Buffet concert. Based upon the evidence presented, I find that he did not. The meaning of "acting in a fiduciary capacity" for purposes of this exception to discharge was examined at length in this court's opinion in Spinoza v. Heilman (In re Heilman), 241 B.R. 137 (Bankr. D. Md. 1999). As Judge Schneider said there,

> The types of fiduciary capacity intended by Congress to render a debt nondischargeable are persons in positions of ultimate trust, such as public officers, executors, administrators, guardians, trustees of express trusts, attorneys, and corporate directors.

Id. at 169-70 (footnotes omitted). Although the meaning of "fiduciary capacity" is not defined in the Bankruptcy Code, "the term is to be narrowly construed in the context of dischargeability of debts in bankruptcy." Id. at 158-59. Thus, Judge Schneider concluded that an express or technical trust – and not one implied by law or imposed by state statute – was necessary for § 523(a)(4) to be applicable. [2] Id.; see also, Hill v. Der (In re Der), 113 B.R. 218, 231 (Bankr. D.

---

[2] This is also the view expressed in Collier on Bankruptcy:

Md. 1989) ("[T]he debtor must have been a fiduciary of an express trust and not one implied by law from the wrongful act itself.").

Nothing in the record before this court demonstrates the existence of an express trust for which Goodwich acted as a trustee for the benefit of Kovens. Nor is there any evidence of the transfer by Kovens to Goodwich of any funds to be held by Goodwich for the benefit of Kovens. The argument made by Kovens rests on two other contentions – namely, that (i) Goodwich was the accountant for Kovens, and (ii) as a result of their relationship, Goodwich was in a position of special knowledge and power as to Kovens such that a fiduciary relationship resulted. Kovens refers this court to a number of opinions that hold that an accountant may be a fiduciary in certain instances. None of those opinions, however, hold that an accountant is a fiduciary for purposes of § 523(a)(4).

Goodwich relies on <u>Holloway v. Faw, Casson & Co.</u>, 319 Md. 324 (1990), as establishing the proposition that under Maryland law an accountant has a fiduciary relationship with a client. It is true that in <u>Holloway</u> the Court of Appeals of Maryland said that "[t]here is a fiduciary relationship between an accountant and client and that feature distinguishes the accounting

---

The scope of the term "fiduciary capacity" is a question of federal law, although state law is considered in the inquiry. Since its appearance in the Act of 1841, the qualification that the debtor be acting in a fiduciary capacity has consistently been limited in its application to what may be described as technical or express trusts, and not to trusts <u>ex maleficio</u> that may be imposed because of the very act of wrongdoing out of which the contested debt arose. The trust relationship must predate and exist apart from the act from which the underlying indebtedness arose.

For purposes of section 523(a)(4), the definition of "fiduciary" is narrowly construed, meaning that the applicable nonbankruptcy law that creates a fiduciary relationship must clearly outline the fiduciary duties and identify the trust property. If applicable nonbankruptcy law does not clearly and expressly impose trust-like obligations on a party, the court will not assume that such duties exist and will not find that there was a fiduciary relationship.

4 <u>Collier on Bankruptcy</u> ¶ 523.10[1][d] (16th Ed. 2014).

profession from a typical commercial business." Id. at 336.  That statement was made, however, in the course of an opinion concerning whether noncompetition agreements by accountants are per se unenforceable as contrary to Maryland public policy.  The Holloway court went on to reject the contention that the accountant-client relationship is like the attorney-client relationship and held that (unlike the Maryland law applicable to attorneys) the public policy of Maryland does not per se prohibit noncompetition agreements among accountants.  Id. at 338.  In Holloway, the court also rejected the argument advanced here by Kovens that the limited accountant-client privilege of Md. Courts and Judicial Proceedings Code Ann. § 9-110 means that accountants must be treated like attorneys.  Id.  Simply stated, nothing in Holloway suggests that an accountant is a fiduciary as a matter of federal law for purposes of § 523(a)(4) of the Bankruptcy Code.

The real thrust of the Kovens argument, therefore, is that a fiduciary relationship resulted in this instance from Goodwich's relative position of knowledge and power over Kovens.  As the Seventh Circuit held in one of the opinions relied upon by Kovens, § 523(a)(4) is applicable when either an express trust is present or when "relations of inequality [exist] that justify the imposition on the fiduciary of a special duty, basically to treat his principal's affairs with all the solicitude that he would accord to his own affairs."  In re Marchiando, 13 F.3d 1111, 1116 (7th Cir. 1994).  As the court explained there, the latter fiduciary relationship arises in "situations in which one party to the relation is incapable of monitoring the other's performance of his undertaking, and therefore the law does not treat the relation as a relation at arm's length between equals." Id.

The evidence presented to this court simply does not support a finding that such a fiduciary relationship existed.  Goodwich is not charged with breach of any duty related to

accounting matters per se, an area as to which Kovens might lack the ability the monitor Goodwich's performance. Rather, the facts before this court show that Goodwich presented Kovens with a business proposition for their mutual profit. Kovens is (and was at the time) an experienced businessman. In fact, he was skeptical of the proposition and was persuaded only by the representations, persistence and apparent creditworthiness of Goodwich. To say that Kovens trusted and relied upon Goodwich is not to say that Goodwich had such knowledge and power that Kovens was not capable of independent business judgment.

As Judge Keir said in Gordon, "not all relationships of reliance rise to the degree of trust required for a finding of defalcation." 491 B.R. at 698. The relationship between Goodwich and Kovens with respect to the Jimmy Buffet Investment Agreement was simply not one that imposed a fiduciary duty on Goodwich. Thus, the exception to discharge under § 523(a)(4) of the Bankruptcy Code does not apply to Goodwich's debt to Kovens.

### B.        Section 523(a)(2)(A)

Under § 523(a)(2)(A) of the Bankruptcy Code, a discharge granted to an individual Chapter 7 debtor does not discharge a debt for money or an extension of credit to the extent obtained by false pretenses, a false representation, or actual fraud. As the Fourth Circuit has explained, a creditor asserting a claim under § 523(a)(2)(A) must prove five elements by a preponderance of the evidence – namely, "(1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages." Nunnery, 478 F.3d at 218. As indicated by the Fourth Circuit in Nunnery, "Congress intended § 523(a)(2) to protect creditors who were tricked by debtors into loaning them money or giving them property, services, or credit through fraudulent means." Id. at 219-20. In addition, it is well settled that § 523(a)(2)(A) bars discharge not merely of claims

for money obtained by fraud or misrepresentation, but also of all claims arising from the money so obtained. As the Supreme Court has held, § 523(a)(2)(A) "encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor." Cohen v. de la Cruz, 523 U.S. 213, 223 (1998). Subsequent to the decision in Cohen v. de la Cruz, the Fourth Circuit held that the language of the Supreme Court's decision there was "broad enough to encompass a situation in which no portion of a creditor's claim was literally transferred to the fraudulent debtor." Pleasants v. Kendrick (In re Pleasants), 219 F.3d 372, 375 (4th Cir. 2000).

### The Threshold Issue

An essential threshold predicate for any claim under § 523(a)(2)(A), however, is that there be a debt for money, property, services, or an extension of credit ***obtained*** by means of false pretenses, a false representation, or actual fraud. As explained by Judge Gregory in his opinion in Nunnery,

> The key in [Cohen v. de la Cruz] is that the debtor obtained something through his fraud. The Court requires at the threshold that the debtor gain something: "Once it is established that specific money or property has been obtained by fraud, however, 'any debt' arising therefrom is excepted from discharge." [523 U.S. at 218.] The Court clarified its holding by stating that subsection (a)(2)(A) "is best read to prohibit the discharge of any liability arising from a debtor's fraudulent *acquisition* of money, property, etc., including an award of treble damages for fraud." Id. at 221 (emphasis added). Admittedly, the Court states several times that the subsection "bars the discharge of *all* liability arising from fraud," but in each example the Court uses to illustrate its point, the debtor has fraudulently obtained money or property from the creditor. Id. at 222 (emphasis added). Although Cohen expands the notion of debt in the context of the fraud exception, it still requires that the debtor have obtained something from the creditor for that debt to qualify for the exception.

478 F. 3d. at 222 (emphasis in original).

Judge Gregory's opinion must be read, however, in the context of the separate opinions filed by the other two judges on the panel. In a concurring opinion, Judge Wilkerson states,

> I write simply to emphasize that [Judge Gregory's opinion] does not open the floodgates to debtors receiving discharges from debts brought about by their own fraud or misrepresentation. Rountree's activity here was nothing if not deceitful as she tracked Nunnery's behavior on behalf of an insurance company under cloak of a pretended friendship. To condemn the behavior, however, is not to say that Rountree obtained "money, property, services" *or other financial benefit* by virtue of her conduct as required by the statute.
>
> I suspect this will not be the usual situation. The more common occurrence will reflect the fact that frauds and misrepresentations are committed precisely for the purpose of obtaining that which the statute forbids. As <u>Pleasants</u> illustrates, to be nondischargeable, money need not pass directly to the debtor from the creditor: the statutory language simply does not add that qualification.

<u>Id</u>. at 223 (Wilkerson, J., concurring) (citations omitted) (emphasis added). As pointed out by Judge Motz in her <u>Nunnery</u> opinion concurring in the judgment, § 523(a)(2)(A) requires at a minimum a loss of property by the creditor – a loss that was not present on the facts in <u>Nunnery</u>. In her view, the debt in question was dischargeable because the creditor "ha[d] not met the § 523(a)(2)(A) requirement that 'the debtor's fraud must result in a loss of property to the creditor.'" <u>Id</u>. (Motz, D., concurring) (quoting <u>Collier on Bankruptcy</u>, ¶ 523.08[1][a] (15th ed. 2004)).

Subsequent to the decision in <u>Nunnery</u>, decisions in this district have generally held that a creditor must establish that the debtor obtained some direct or indirect benefit through fraud in order to prevail on a claim under § 523(a)(2)(A). <u>See, e.g.</u>, <u>Rimal v. Winisono (In re Winisono)</u>, 412 B.R. 747, 754 (Bankr. D. Md. 2009) ("'[T]he plain language of 11 U.S.C. § 523(a)(2)(A) and the Supreme Court's interpretations of that language require that the debtor must obtain something through fraud for the exception to apply.'"); <u>Ultra Litho v. Moore (In re Moore)</u>, 365

B.R. 589, 599-602 (Bankr. D. Md. 2007) ("A threshold inquiry under Section 523(a)(2)(A) is whether the Debtor received value as a result of the fraudulent conduct."); Hale Trailer, Brake & Wheel, Inc. v. Cramblitt (In re Cramblitt), 2010 WL 3245387, *5 (Bankr. D. Md. Aug. 17, 2010) (Section 523(a)(2)(A) applies when the debtor "made the fraudulent representations for the purpose of receiving a benefit, and in fact received that benefit albeit that it was indirect.").

The views expressed in Cramblitt are well-reasoned and persuasive.  In that unreported opinion, Judge Keir rejected the argument that Nunnery compelled determination that a debt is dischargeable under § 523(a)(2)(A) if a debtor did not benefit directly from his fraud.  Judge Keir declined to "read the opinion in Nunnery quite so restrictively."  Cramblitt, at *4.  Reading Nunnery together with the Fourth Circuit's earlier decision in Pleasants, Judge Keir held that a debt is not dischargeable under § 523(a)(2)(A) when the debtor's fraud resulted in an indirect benefit to the debtor.  Cramblitt, at *1.  Judge Keir found there was an indirect benefit to the debtor in Cramblitt because the creditor's claim was for an extension of credit to a business the debtor had also loaned money to and under whose health insurance plan the debtor was covered.

As Kovens argues, other Circuits that have considered the issue have held – like  Judge Keir in Cramblitt – that a benefit to the debtor is sufficient to except a debt from discharge under § 523(a)(2).  For example, what is known as the "receipt of benefits" theory was adopted by the Eleventh Circuit in HSSM#7 Limited Partnership v. Bilzerian (In re Bilzerian), 100 F.3d 886 (11th Cir. 1996), requiring "that the debtor gain a *benefit* from the money that was obtained by fraudulent means."  Id. at 890 (emphasis in original).  Prior to the decision in Bilzerian, that theory was also adopted by the Fifth, Sixth, and Ninth Circuits.  See BancBoston Mortgage Corp. v. Ledford (In re Ledford), 970 F.2d 1556 (6th Cir. 1992); Luce v. First Equipment Leasing Corp. (In re Luce), 960 F.2d 1277 (5th Cir. 1992); Ashley v. Church (In re Ashley), 903

F.2d 599 (9th Cir. 1990). These earlier decisions from other Circuits are not referred to by the Fourth Circuit in either <u>Pleasants</u> or <u>Nunnery</u>. The parties have not referred me to, and my own research has not found, any reported decision in which the "receipt of benefits" theory has been expressly adopted (or rejected) by the Fourth Circuit. Nevertheless, in my view <u>Pleasants</u> and <u>Nunnery</u> taken together adopt what is essentially the same approach – that is, a debt is nondischargeable under § 523(a)(2)(A) if the debtor's fraud or misrepresentation enabled a third party to obtain money, property, services, or an extension of credit from the creditor, and the debtor obtained thereby some direct or indirect benefit.[3]

In the instant case, this threshold standard is satisfied. There is no question that Kovens suffered a loss by reason of Goodwich's misrepresentations; he made a $302,500 loan to Charm City that was not repaid. Goodwich was an active participant in persuading Kovens to make the loan to Charm City. The loan was needed to finance a business venture in which Goodwich was himself a participant. As a result of his actions, Goodwich received a direct benefit – namely, the Jimmy Buffet Investment Agreement under which he expected to receive 20% of the profits from the Jimmy Buffet concert. That those profits were (unknown to Goodwich) illusory is immaterial. If Glorioso had been a legitimate but ineffective promoter who simply failed to repay the Kovens loan in full, Goodwich would be in the same situation as the one he finds

---

[3]   After its decision in <u>Luce</u>, the Fifth Circuit held (relying on <u>Cohen v. de la Cruz</u>) that the plain language of § 523(a)(2)(A) requires no "receipt of benefits." <u>See</u> <u>Deodati v. M.M. Winkler & Assocs. (In re M.M. Winkler & Assocs.)</u>, 239 F.3d 746, 749 (5th Cir. 2001). Similarly, the Ninth Circuit more recently also held there is "no requirement that the debtor have received a direct or indirect benefit from his or her fraudulent activity in order to make out a violation of § 523(a)(2)(A)." <u>Ghomeshi v. Sabban (In re Sabban)</u>, 600 F.3d 1219, 1222 (9th Cir. 2010). The Fourth Circuit's opinion in <u>Pleasants</u> was decided before <u>M.M. Winkler</u> and <u>Sabban</u>. In <u>Nunnery</u>, the Fourth Circuit makes no mention of the Fifth Circuit's prior decision in <u>M.M. Winkler</u>. Because I find that Goodwich received a direct benefit by means of his misrepresentations, I need not decide whether the Fourth Circuit would adopt the views expressed by the Fifth and Ninth Circuits that a creditor is not required to prove receipt by the debtor of a direct or indirect benefit in order to prevail on a claim of nondischargeability under § 523(a)(2).

himself in here. In either case, his misrepresentations induced a loan to benefit a failed business venture. Goodwich should not be in a better legal position merely because he made misrepresentations about his profits on an investment with someone who proved to be a dishonest promoter rather than simply an innocently unprofitable one. Thus, the threshold issue does not preclude the claim made by Kovens under § 523(a)(2)(A).

## The Five Elements

The actions taken by Goodwich to induce participation by Kovens in the Jimmy Buffet Investment Agreement satisfy all five elements for nondischargeability under § 523(a)(2)(A).[4] Goodwich made false representations regarding the profits from his dealings with Glorioso. The representations were false because there were in fact no profits realized by Charm City from the Amy Grant concerts. Goodwich nevertheless led Kovens to believe he could expect profits from the Jimmy Buffet concert on that basis, all at a time when Goodwich had no knowledge as to whether profits were actually realized on the Amy Grant concerts.

It is possible that Goodwich anticipated the profits he claimed, and simply was unaware that he was being defrauded by Glorioso. Goodwich's state of mind at the time with respect to Glorioso's fraud, however, is not relevant to the outcome here. Goodwich knew he did not know whether profits had been realized as he represented. He was eager to induce his friend to invest in the Jimmy Buffet concert venture to secure a share of the supposed profits for himself. Goodwich presented what was either unverified information or definitively false information to Kovens in an effort to induce him to make the loan to Charm City and to enter into the Jimmy Buffet Investment Agreement. Regardless, a false representation made as a result of inadequate

---

[4]   As explained above, the five elements are: (1) false representation, (2) knowledge that the representation was false, (3) intent to deceive, (4) justifiable reliance on the representation, and (5) proximate cause of damages. Nunnery, 478 F.3d at 218.

knowledge is sufficient to impute to the debtor the actual knowledge that the representation is false.[5]  Sandberg v. Virginia Bankshares, Inc., 979 F.2d 332, 345 (4th Cir. 1992) ("A tort action for deceit requires proof of scienter … which is satisfied where a party acts with conscious disregard of whether a representation is true."), vacated on other grounds, 1993 WL 524680 (4th Cir. 1993).  Accord Exxon Mobil Corp. v. Albright, 433 Md. 303, 334 (2013) ("To establish fraud, a plaintiff must prove … the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth.").  Whether Goodwich knew of, or was merely unsure as to, the falseness of his purported profits is inconsequential.  He obviously had the intent to deceive Kovens; otherwise, Goodwich would have had no cause to misrepresent the supposed profits he had not actually made.  "[A] debtor's intent to deceive may be inferred from his false representation to the plaintiff."  In re Smith, 25 B.R. 396, 398 (Bankr. D. Md. 1982).  See also Morimura, Arai & Co. v. Taback, 279 U.S. 24, 33 (1929) (finding under § 14 of the Bankruptcy Act that "reckless indifference to the actual facts" is sufficient for purposes of nondischargeability for intentional misrepresentation).

Additionally, Kovens was undeniably deceived by the false representations − stating repeatedly in his testimony that he relied on them in investing with Glorioso and making the loan to Charm City.  The Supreme Court has held that "'[a]lthough the plaintiff's reliance on the

---

[5]  The Restatement of Torts, Ch. 22, Topic 1, Conditions Under Which Misrepresentation Is Fraudulent (Scienter), contains an official comment also supporting this proposition, which clearly is applicable to this case:

> A states to B that C's financial position justifies B in giving him credit in a particular sales transaction.  A knows that B will understand that the statement is based upon A's personal dealings with C.  In fact A has had no such dealings with C but has heard from what he regards as reliable sources that C's financial position is first rate.  C is insolvent and B is unable to collect his debt from him.  A is subject to liability to B for the loss that B suffers through relying upon his statement if the circumstances justify his reliance upon A's supposed personal knowledge.

Restatement (Second) of Torts § 526 cmt. f, illus. 1 (1977).

misrepresentation must be justifiable … this does not mean that his conduct must conform to the standard of the reasonable man.'"  Field v. Mans, 516 U.S. 59, 70-71 (1995) (citations omitted). In the instant case, however, reliance by Kovens was both justifiable and reasonable: he trusted his long-time friend and accountant, trusted his recommendation, and further was persuaded by the (false) evidence that he had profited very recently from a similar concert venture with Glorioso.  Under the holding in Field v. Mans, whether a creditor is justified in relying on a particular misrepresentation is a question of fact that depends upon proof that the creditor "was justified in doing so because of its 'qualities and characteristics' and 'the circumstances of the particular case.'"  Marianucci v. SG Homes Asso., 472 B.R. 299, 309 (D. Md. 2012) (quoting Columbo Bank v. Sharp (In re Sharp), 340 Fed. Appx. 899, 906 (4th Cir. 2009) (unpublished per curiam opinion)).

That Kovens might have further investigated and discovered the falseness of Goodwich's representations is no bar to a fraudulent misrepresentation claim.  Field v. Mans, 516 U.S. at 70. As the court said in Marianucci, "[a]lthough a creditor is not entitled to 'blindly rely' on a patently false statement, it is justified even if it 'might have ascertained the falsity of the representation had [it] made an investigation.'"  472 B.R. at 310 (quoting Sharp, 340 Fed. Appx. at 906-07).  Numerous cases have also held that evidence of friendship weighs heavily in favor of finding justifiable reliance.  See Lance v. Tillman (In re Tillman), 197 B.R. 165, 171 (Bankr. D.D.C. 1996) (citing collection of cases finding that evidence of friendship "weighs heavily in favor of finding at least justifiable reliance if not the higher level of reasonable reliance").  As Judge Teel said in Tillman, "courts reason that creditors are not to be faulted for relying on the honesty of close friends who take advantage of them."  Id.  This court agrees with that view and finds it applicable here.  In this case, Kovens relied on the misrepresentations by Goodwich (who

was both his friend and his accountant) about his profits on the Amy Grant concerts and was justified in doing so.

Lastly, there is no doubt that the misrepresentations made by Goodwich persuaded Kovens to invest with Glorioso and caused his loss on the loan to Charm City. At the time these events unfolded, Kovens was not seeking investment advice and had no interest in concert promotion. Goodwich contacted Kovens and pressed him to enter into the Jimmy Buffet Investment Agreement. Kovens asked Goodwich to substantiate his profits with Glorioso, and Kovens was willing to make the loan to Charm City only after receiving what he believed was (and was offered as) a record of actual profits being realized on the Amy Grant concerts. Kovens would not have agreed to Goodwich's proposition absent the materially false representation that Goodwich had actually profited from the Amy Grant concerts. Thus, Kovens has proven all five elements, and Goodwich's debt to Kovens is nondischargeable under § 523(a)(2)(A).

### C.    Section 523(a)(2)(B)

The Fourth Circuit recently addressed the requirements of § 523(a)(2)(B), stating, "[i]n order to satisfy subsection (2)(B), a creditor must prove five elements: (1) 'use of a statement in writing,' (2) 'that [was] materially false,' (3) 'respecting the debtor's … financial condition,' (4) 'on which the creditor … reasonably relied,' and (5) 'that the debtor caused to be made or published with intent to deceive.'"    Sharp, 340 Fed. Appx. at 900 (quoting 11 U.S.C. § 523(a)(2)(B)). The Fourth Circuit's unpublished opinion in Sharp has been referred to frequently by bankruptcy courts in this circuit that have been asked to consider application of § 523(a)(2)(B). See, e.g., Ocean Equity Group v. Wooten (In re Wooten), 423 B.R. 108, 124 (Bankr. E.D. Va. 2010); Andresen & Arronte, PLLC v. Hill (In re Hill), 425 B.R. 766, 779 (Bankr. W.D.N.C. 2010).

As a general proposition, the provisions of § 523(a)(2)(A) and § 523(a)(2)(B) are "mutually exclusive." Thompkins v. Whitenack (In re Whitenack), 235 B.R. 819, 823 (Bankr. D.S.C. 1998) (quoting In re Ransford, 202 B.R. 1, 3 (Bankr. D. Mass. 1996)); see also Green v. Bashor (In re Bashor), 2011 WL 4595508, *4 (W.D.N.C. Sept. 29, 2011). As the Supreme Court has explained,

> [These are] two close statutory companions barring discharge. One applies expressly when the debt follows a transfer of value or extension of credit induced by falsity or fraud (not going to financial condition), the other when the debt follows a transfer or extension induced by a materially false and intentionally deceptive written statement of financial condition upon which the creditor reasonably relied.

Field v. Mans, 516 U.S. at 66; see also Wooten, 423 B.R. at 127 (quoting Sharp, 340 Fed. Appx. at 900-01).

Although they may be said to be mutually exclusive, § 523(a)(2)(A) and § 523(a)(2)(B) also share as a common element the introductory language of § 523(a)(2).[6] Thus, the exception to discharge in either subsection applies only to a debt for money or an extension of credit obtained from the creditor. Accordingly, § 523(a)(2)(B) presents the same question as the one considered above with respect to § 523(a)(2)(A) – namely, whether the debtor received some direct or indirect benefit by means of the written statement of financial condition in question. See Field v. Mans, 516 U.S. at 68, n.7. As discussed above with respect to § 523(a)(2)(A), in this case there is evidence of such a direct benefit obtained Goodwich – that is, the Jimmy Buffet Investment Agreement.

---

[6] The notion that these two provisions are mutually exclusive does not preclude the possibility that they might both be applicable in circumstances like those presented here – namely, where the debtor made both false oral representations (about supposed profits on the Amy Grant concerts) and used a materially false financial statement (about his supposed net worth).

### The Five Elements

The evidence presented at trial is sufficient to satisfy all five elements for nondischargeability under § 523(a)(2)(B).  Goodwich gave Kovens a financial statement dated June 10, 1999 under circumstances that implied it was still accurate as of December 13, 1999. It was not.  That financial statement indicated that Goodwich's net worth was $1,417,777.  It understated his liabilities, however, by at least $980,000.  The financial statement was a statement in writing used by Goodwich that was materially false concerning his financial condition.  Thus, the first three elements of § 523(a)(2)(B) are satisfied in the instant case.

Kovens reasonably relied upon Goodwich's financial statement.  Based upon the financial statement Kovens believed that Goodwich was creditworthy and could satisfy his guaranty of the $302,500 loan to Charm City.  A claim under § 523(a)(2)(B) is valid only if the creditor's reliance was reasonable, not merely justifiable.  Field v. Mans, 516 U.S. at 66. Whether reliance was reasonable is a question of fact that "should be judged in light of the totality of the circumstances."  Coston v. Bank of Malvern (In re Coston), 991 F.2d 257, 261 (5th Cir. 1993).  See also, First National Bank of Olathe v. Pontow (In re Pontow), 111 F.3d 604 (8th Cir. 1997); Bank of Nebraska v. Rose (In re Rose), 483 B.R. 540 (8th Cir. B.A.P. 2012).  Among the things a bankruptcy court should consider are whether (i) prior "business dealings with the debtor that gave rise to a relationship of trust," (ii) "there were any 'red flags' that would have alerted an ordinary prudent lender to the possibility that the representations relied upon were not accurate," and (iii) "even minimal investigation would have revealed the inaccuracy of the debtor's representations."  Coston, 991 F.2d at 261.  See also, Guaranty Residential Lending v. Koep (In re Koep), 334 B.R. 364, 373 (Bankr. D. Md. 2005).  Considered in light of this standard, reliance by Kovens was reasonable.

As described above, Kovens relied on Goodwich's purportedly accurate financial statement. It represented that Goodwich was more than able to repay the loan made by Kovens if Charm City or Glorioso did not. His reliance was particularly reasonable here given that the financial statement was provided to Kovens by a trusted and longtime friend who was also his accountant. The financial statement was presented in the context of repeated statements by Goodwich that he was realizing profits on the Amy Grant concerts, which negated any adverse effect on his apparent financial condition or red flag by reason of his guaranty obligation to Nechay. Thus, Kovens was not required to investigate the matter further. To find otherwise would impose on Kovens the unreasonable obligation to conduct an investigation to discover the circumstances of Glorioso's fraud that Goodwich himself asserts he did not uncover until after Kovens made the loan to Charm City.

Goodwich intended to deceive Kovens by means of the false financial statement. As with my analysis under § 523(a)(2)(A), I infer from Goodwich's use of a materially false financial statement and his reckless disregard for truth as to its accuracy that his intent was to deceive Kovens. Goodwich claimed to have a sufficient net worth to repay the loan because Kovens would not have made the loan otherwise. When Glorioso's fraud was discovered, Goodwich was unable to satisfy his guaranty to Kovens because of his $980,000 in liabilities to Nechay that were omitted from the financial statement. Goodwich was eager to obtain participation by Kovens in the Jimmy Buffet Investment Agreement thereby securing for himself what he perhaps perceived as easy profits. Goodwich knew Kovens had no interest in concert promotion investments and pressed him repeatedly to make the loan to Charm City. Goodwich knew Kovens trusted him and knew he would – and intended for him to – rely on his deceptive financial statement. Under the circumstances, Goodwich used the financial statement either

knowing it was false or with reckless disregard for its truthfulness.  Absent that deception, the loan to Charm City would never have been made.  As a result, Kovens has proven all five elements, and Goodwich's debt to Kovens is also nondischargeable under § 523(a)(2)(B).

## CONCLUSION

For the above reasons, the claim asserted by Kovens against Goodwich is excepted from discharge under both § 523(a)(2)(A) and § 523(a)(2)(B) of the Bankruptcy Code.  Thus, it is a debt that has not been discharged by the Order Granting Discharge to Debtor entered in Goodwich's main Chapter 7 bankruptcy case.  An order will be entered consistent with this Memorandum Opinion.

cc:     Kristen M. Siracusa, Esq.
        Jan L. Berlage, Esq.
        Joseph J. Bellinger, Chapter 7 Trustee
        Gerard R. Vetter, Assistant U.S. Trustee

**-- End of Memorandum Opinion --**